MR. JUSTICE SHEEHY,
dissenting:
I dissent.
A casual reader of the foregoing opinion might wonder why anyone would dissent in this case. The answer is that additional facts are needed to give a full background of what happened here.
The killings in this case occurred on February 25, 1981. From February 26, 1981 onward, William Norgaard was the prime suspect in this case. He was hospitalized most of the time from February 26, 1981, until his arrest on March 4, 1981. While he was not technically “in custody” in the period prior to March 4, 1981, he was subjected to interrogation by the authorities, including Agent Carrell, on several occasions.
Norgaard was interviewed, or an interview of him was attempted five times between February 26, and March 4, the day he was charged with the crimes. On three of those occasions, on February 26, 1981, in Poplar, Montana, on March 2, 1981, when he was in the hospital, and on March 4, 1981, after he had been arraigned, written waivers of his right to have counsel present were signed by Norgaard. At all other times, and there were many, including the two interviews by Agent Carrell in Missoula, no written waivers were acquired, although Agent Carrell testified that oral Miranda warnings were given to Norgaard.
Norgaard was in the hospital, either in Wolf Point or in Missoula, Montana, most of the time from and after February 26, 1981.
Norgaard, to put it mildly, was a sick man. Approximately 26 years old, he had suffered most of his teen and adult life *179 from the disease of colitis. When he arrived in the hospital in Missoula on March 11, 1981, he was weak from loss of blood, and had undergone a period of sustained rectal bleeding. Dr. Stratford, a psychiatrist, testified that when defendant came to Missoula “he needed to be seen by [doctors] who see this kind of people every day, an internist and a gastroenterologist.”
Colitis was not his only illness. Since the defendant was 13 years old, he had “historically a severe mental illness, and he has undergone years and years of treatment, electric shock treatments, massive doses of anti-psychotics, multiple years of therapy with a psychiatrist, and in-patient and outpatient. . .” treatment. Dr. Stratford, who had never seen the defendant before, inadvertently lowered the defendant’s prescription of Haldol, an anti-psychotic drug, to one milligram per day whereas in the previous weeks in Wolf Point, he had been given doses each day of Haldol ranging from 6 milligrams to 22.5 milligrams.
The defendant was arraigned on March 4, 1981, in Wolf Point. The District Court judge came to the defendant’s hospital room in order to arraign him. An attorney was not appointed for him at that time because his family indicated they might seek their own counsel.
On March 10, 1981, the District Court appointed Francis McCarvel, of Glasgow, to represent the defendant. At the time of Mr. McCarvel’s appointment, the defendant was in Missoula, Montana, where he had been sent by the State for psychiatric evaluation by Dr. Stratford. Missoula is 439 miles from Glasgow, where McCarvel resides and has his offices, and 488 miles from Wolf Point, where the charges were pending against the defendant.
James McCann is the county attorney in Roosevelt County, of which the county seat is Wolf Point, where the crimes were committed. Although McCarvel resides in Glasgow, he is frequently called on to represent defendants by appointment in the judicial district including Roosevelt County. There is a standing agreement between attorneys *180 McCann and McCarvel that no defendant that McCarvel is appointed to represent will be interrogated in McCarvel’s absence by law enforcement officials. It is obvious that Mc-Carvel saw no reason to hurry to Missoula, nearly 500 miles away, to interview his newly-found client until the psychiatric evaluation of the defendant in Missoula had been completed.
On March 11, 1981, Dr. Stratford, in Missoula, called the special prosecutor in the Attorney General’s office in Helena, Montana, some 120 miles away to tell the special prosecutor that the defendant should have an attorney because he was beginning to make incriminating statements against his own interests. The special prosecutor called into his office in Helena Special Agent Carrell, and together they discussed the propriety and ethics of Carrell attempting to interview the defendant in the absence of his counsel and before his counsel had a chance to consult with his client and advise him of his right to protect himself in this case. The special prosecutor left the decision up to the agent and Carrell lost no time in proceeding immediately to Missoula to interview Norgaard, which he did beginning that evening of March 11, 1981.
The handwritten notes of Agent Carrell respecting his interview of Norgaard are more revealing than anything I could write or the majority has said with respect to the consent of Norgaard to the interview and his purported relinquishment of his right to counsel:
“2045-2145
“[8:45 p.m.-9:45 p.m.]
“Interviewed Norgaard
“Advised rights
“Attorney McCarvel had been appointed
“advised charged w/
“who I was & why I was there. Nodded — understood all—
“Nodding & shaking of head”
Also revealing from the handwritten notes of Agent Carrell are his recorded statements to Norgaard:
*181 “Explained to Bill preponderance of evidence against him
“shell casings match
“possibility of fingerprints on casings”
On the morning of March 12, 1981, Agent Carrell came again to the hospital room to interview Norgaard. Again his notes are revealing:
“Introduced myself against [sic] as CIB Agent — showed Bill badge — took it looked at it.
“Advised Bill of rights verbally & specifically advised him he did not have to talk to me — said he understood.
“Again advised Bill an attorney named Jim McCarvel had been appointed by the court to represent him — he understood
“Advised Bill he could have attorney present or talk to him before talking to me — he understood
“Advised Bill again he was charged with the homicide of Stanley Nees, Mildred Geer, and Leota Hoye — He understood.
“Asked again if he knew who I was
“He said, ‘You’re a police officer?’ I replied yes.”
And finally, as startling as it is revealing, are the notes respecting the conclusion of the interview:
“Advised ‘You’re [sic] attorney, Mr. McCarvel, will probably be getting in touch w/you.’ reply ‘What’s the difference between an attorney and a lawyer?’ I stated ‘They’re the same thing.’
“Bill ásked ‘Will he represent me?’ I replied, ‘He has been appointed to represent you. Anything he does will be what he considers to be in your best interests. He’s a good lawyer.’
“Bill asked, ‘When will he talk to me?’ I replied T don’t know, but it will probably be in the next few days.’ ”
It is true that Dr. Stratford testified that on the night of March 11, 1981 and on the morning of March 12, 1981, Norgaard was capable of making decisions, even though his intelligence was in the lower normal range. What is sadly lacking in the testimony respecting his mental ability, how *182 ever, is whether he had the requisite knowledge to make a knowing and voluntary waiver of his right to counsel. His question to Carrell as to what was the difference between an attorney and a lawyer indicates a very rudimentary knowledge of what he was about or perhaps his inability to grasp what was being said to him respecting his right to have counsel present. That is one of the reasons why I think the State had not carried its “heavy burden” of showing that Norgaard’s waiver of right to counsel was knowing and voluntary.
I also believe that the evidence does not sustain a knowing and voluntary waiver of Norgaard’s right to have counsel present during his interviews because he was never given a chance to consult with his own counsel to learn exactly how those rights operate. Here the State deliberately beat Norgaard’s counsel to the punch, in spite of the long-standing agreement between McCarvel and the county attorney of Roosevelt County to respect McCarvel’s right, and it is a right of fair and influence-free consultation with his clients under his appointments by the court.
It is on a fact situation such as we find here that the New York court adopted its per se rule in People v. Hobson, supra, cited in the majority opinion. Norgaard’s evident confusion as to what a lawyer is, the surreptitious trip to Missoula by Agent Carrell, the special prosecutor’s calling in of Agent Carrell when he learned that Norgaard was becoming talkative, the lack of an immediate telephone call by the state counsel to the appointed attorney, and the lack of a written Miranda waiver from Norgaard in the two crucial interviews in Missoula, all lead me to conclude that the State might well stretch a point when its agents testify that Norgaard’s consent to be interrogated in the absence of counsel was knowing and voluntary.
I would suppress the statements made by Norgaard in the Missoula interviews, and remand the cause for a new trial. There is probably enough remaining evidence against him to bring about his conviction in any event.
*183 One’s credibility is at nadir when it is more important to win than to be honorable.
If another trial were granted, I would also instruct the District Court to ascertain the physical and mental health of the defendant at the time of the crime. Here no evidence was given on that important aspect of the case. Then certainly the jury could decide whether these killings involved mitigated deliberate homicide under proper evidential background. The jury in this case convicted the defendant without any knowledge of his mental difficulties.
MR. JUSTICE SHEA joins in the dissent of MR. JUSTICE SHEEHY.